## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PATRICK PIZZELLA,               :

            Plaintiff,        :

            :

     v.              :

            :

EMPIRE DINER,            :     Civil Action No.: 2:18-cv-04663-ER

            :

         Defendants.     :

            :

            :

            :

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

In accordance with this Court's Order dated April 7, 2022 (ECF No. 67), Defendants Mosluoglu, Inc. d/b/a Empire Diner, Ihsan Gunaydin and Engin Gunaydin, by and through their undersigned counsel, hereby submit the following Proposed Findings of Fact and Conclusions of Law following trial.

## I.   PROPOSED FINDINGS OF FACT

### A.  ENGIN GUNAYDIN'S EMPLOYMENT

1. Engin Gunaydin is not the owner of Empire Diner. (Ihsan Gunaydin Deposition Transcript, hereinafter "I.G. Dep." at 7:8-10, attached as Exhibit A) (Engin Gunaydin Deposition Transcript, hereinafter "E.G. Dep." at 9:6-8, attached as Exhibit B) (Trial Day 3 Transcript at p. 25 ll. 24-25).

2. Ihsan Gunaydin had ultimate decision-making authority and exclusively operated and controlled the diner. (I.G. Dep. 16:6-9, 17:18-24) (E.G. Dep. 16:1-4, 22:14-22; 23:6-12) (Trial Day 3 Transcript at p. 26 ll. 1-25).

3. Engin Gunaydin did not order the food, and did not make any decisions regarding pay and payments to employees, assignment of work in the kitchen, supervising the kitchen staff or setting employees' work schedules. (I.G. Dep. 17:23-24) (E.G. Dep. 22:14-22, 23:6-12, 23:16-20). (Trial Day 3 Transcript p. 26 ll. 1-25) (Trial Day 3 Transcript p. 28 ll. 24-25 to p. 29 ll. 1-15).

4. Engin Gunaydin was not the ultimate decision-maker with respect to hiring and firing decisions. (I.G. Dep. 16:6-9) (Trial Day 3 Transcript p. 26 ll. 1-3).

5. Engin Gunaydin reported to Ihsan Gunaydin, and all decisions required Ihsan's consent and approval. (I.G. Dep. 17:18-23). (Trial Day 3 Transcript p. 26 ll. 1-25).

6. Engin Gunaydin's duties included working the cash register, washing dishes, bussing tables, cleaning restrooms, cooking and general cleaning. (E.G. Dep. 11:13-15). (Trial Day 3 Transcript p. 26 ll. 19-25 to p. 27 l. 6).

7. Engin Gunaydin exercised little to no control over Empire Diner's daily functions, financial affairs, and compensation practices. (E.G. Dep. 16:1-3).

8. Engin Gunaydin had no role in Empire Diner's decision to compensate (or not to compensate) employees; no power to set wages or benefits. (E.G. Dep. 16:1-3) (Trial Day 3 Transcript p. 26 ll. 6-8).

9. Engin Gunaydin does not control or retain employment or payroll records at Empire Diner. (E.G. Dep. 16:1-3) (Trial Day 3 Transcript p. 28 ll. 24-25 to p. 29 ll. 1-15).

**B. AMOUNT OF BACK WAGES**

10. The total amount of back wages for the appropriate two-year period of January 12, 2016 through January 14, 2018 is $418,635.44.  This includes $400,482.74 with

respect to alleged Section 6 minimum wage violations and $18,152.70 with respect to alleged Section 7 overtime violations. *See* Def. Trial Exhibit 2 at pp. 001-084.[12]

11. The total amount of back wages for the three-year period of January 12, 2015 through January 14, 2018 is $596,103.89.  This includes $573,800.93 with respect to alleged Section 6 minimum wage violations and $22,302.96 with respect to alleged Section 7 overtime violations. *See* D-2 at pp. 085-168.

12. Defendants did not charge employees for broken dishes. (Trial Day 3 Transcript p. 42 ll. 14-25).

13. Even the very few government witnesses who testified that Empire sometimes charged for broken dishes testified it was an extremely rare occurrence:

    a. Tammy Reardon worked at Empire for 13 years and was never charged for plate breakage or walkouts. (Trial Day 1 Transcript p. 58 ll.15-18).

    b. Carlin Stansfield worked at Empire for one year and was never charged for walkouts or plate breakage. (Trial Day 1 Transcript p. 98 ll.19-20).

    c. Marie Sheeran worked at empire for 9 years and was never charged for plate breakage. (Trial Day 1 Transcript p. 154 ll. 24-25) (G-46 P. 2). She

---

[1] Defendants' Trial Exhibit 2 are spreadsheets based upon the Plaintiff's calculations of alleged back wages, with entries removed that were outside of the applicable date range and other adjustments made for employees that Defendants know to be deceased.  The changes made to the Plaintiff's damages spreadsheet have been highlighted, where entries were removed.  The calculations for the two-year period of January 12, 2016 through January 14, 2018 appear at pages 001-084 (with totals for minimum wage and overtime appearing at pages 077 and 084), while the calculations for the three-year period of January 12, 2015 through January 14, 2018 appear at pages 085-168 (with totals for minimum wage and overtime appearing at pages 161 and 168).

[2] Defendants' Trial Exhibits are hereinafter referred to with the moniker "D" followed by the exhibit number (i.e. D-2), while the Plaintiff/Government's Trial Exhibits are hereinafter referred to with the moniker "G" (i.e. G-2).

further testified that dishes didn't break often (but it was enough). (Trial Day 1 Transcript p. 154 ll. 17-19)

    d. Francis Tepper worked for Empire for 32 years and claimed she was charged a fee for breakage only once; she alleged she was charged $20 for a platter (G-42 P. 2) (Trial Day 1 Transcript p. 165 l. 25; p. 166 ll. 1-5). She further admitted that in her 32-year career at Empire she was unaware of **anyone else** ever being charged for a broken plate. (Trial Day 1 Transcript p. 174 ll. 3-5).

14. Even the very few government witnesses who claimed there was a breakage fee, varied greatly in how much they claimed that fee was: their testimony ranged from $5 a piece to $20 a piece:

    a. Tammy Reardon, who was never herself charged for breakage, said other people were charged $10 a plate. (Trial Day 1 Transcript p. 91).

    b. Marie Sheeran worked at empire for 9 years and was never charged for plate breakage, but said a busboy once got charged $50 for breaking 10 dishes ($5 a piece) (Trial Day 1 Transcript p. 155 ll. 3-8).

    c. Francis Tepper claimed she paid $20 for breakage. (Trial Day 1 Transcript p. 174 ll. 6-9).  Ms. Tepper had previously claimed the broken plate fee was $10 when interviewed by Mr. Martin. (G-29 p. 102 P.2) (Trial Day 1 Transcript p. 175ll. 12-22).

15. Of the 25 witnesses interviewed during the government's investigation, 24 did not confirm the broken plate fee despite being asked to do so.  Only one witnesses

supported Investigator Martin's finding of "fact" that Empire charged a broken plate fee. (D-43 Columns B-Z l. 6) (G-6).

16. So, despite evidence that barely anyone was charged a broken plate fee in many years of service, the Government now seeks a broken plate fee of 1 dish per week per employee**.**  By way of comparison, 4 government witnesses with 55 years of combined experience were charged for one plate one time. (¶¶ 13(a)-13(d)). Thus, based on the government's evidence, If the Court determines a breakage fee is appropriately assessed, perhaps it should be one plate per 2,860 weeks per employee. (55x52=2860).

17. Defendants' witnesses confirmed there was no breakage fee. (D-7 P. 14) (D-6 P. 14).

18. Government witness Tammy Reardon was very angry based on what the government had told her she should have been paid at the rate of $7.25 per hour plus tips rather than how she had been paid.  Nobody had taken the time, nor had she herself taken the time to realize she was earning substantially in excess of the minimum wage all along.  Regarding Empire she said, "**they needed to learn a lesson**". Consider her own testimony, that she was working 20-24 hours per week.  (Trial Day 1 Transcript p. 58 ll. 19-25), and her estimate of her own tips at $150-$300 per week. (Trial Day 1 Transcript p.61 ll. 4-8).  Those numbers would make her wage with salary a minimum of between $9.08 per hour ($150/24= $6.25 + $2.83= $9.08) and $17.83 per hour ($300/20= $15 + 2.83+ $17.83) during the relevant time.  Despite earning these kinds of sums, after speaking to the Department of Labor she was convinced she was cheated by Empire.  And how much did this angry witness make in her latest stint at Empire in May of 2021? In her daily tip sheet, she recorded credit card tips of

$1,486 for the month of May. (D-41). Because she did not report cash tips we will never know how much she actually made, but based on her reported hours of 20-24 per week with credit card tips alone she earned a minimum of between $18.31 per hour ($1,486/96= $15.48 + $2.83= $18.31) and $21.41 per hour ($1,486/80= $18.58 +$2.83= $21.41). Amazingly, these are the kind of wages Empire servers earn, and the government has somehow convinced the servers they are victims who need to teach their employer a lesson.

19. With the exception of only one witness, the servers called as trial witness claimed either they did not know about the minimum wage, did not know they were entitled to receive it between salary and tips or both.

**C.    NO WILLFUL VIOLATION**

20. It was abundantly clear to Defendants that, between wages and tips, the servers earned far in excess of $7.25 per hour. (A.G. Dep. 41:12-13); (Gyasi Martin Deposition Transcript, hereinafter "Martin Dep." at 61:19-20, attached as Exhibit C) (Trial Day 3 Transcript p. 37 l. 24 to p. 40 l. 15) (Trial Day 3 Transcript p. 113 l. 21 to 115 l. 3) (Trial Day 3 pp. 119-121).

21. Defendants knew how much the servers were receiving in credit card tips and that credit card tips alone were enough or nearly enough to bring the servers to minimum wage. (Trial Day 3 Transcript p. 38 ll. 11-18) (Trial Day 3 Transcript p. 113 l. 21 to 115 l. 3).

22. There was testimony that the servers were making between 20 and 80 percent of their tips in cash, but Engin Gunaydin explains it is more like the middle of that range at 50% credit cards and 50% cash. (Trial Day 3 Transcript p. 38 l. 19 to p. 39 l. 5).

23. Engin Gunaydin commonly sees servers earn $80-$90 in tips for a 6-hour shift. (Trial Day 3 Transcript p. 39 l. 20 to p. 40 l. 15). This represents a range of $16.16 per hour ($80/6= $13.33+2.83= $16.16) to $17.83 per hour for the putative victims in this case.

24. Empire relied upon its accounting firms and payroll companies in making its overtime payments. (Trial Day 3 Transcript p. 29-31) (Trial Day 3 Transcript p. 32 ll. 22-24 and p. 35) (Trial Day 3 Transcript p. 74 ll. 3-14) (Trial Day 3 Transcript pp. 94-96).

25. Because the servers would not report their cash earnings, Defendants were compelled to "guesstimate" the total amount (Trial Day 3 Transcript p. 33 l.14 to p. 34 l. 13) (Trial Day 3 pp. 86-88).

26. Even now, with Empire insisting on servers filling out tip record sheets, servers are loathe to report anything but the credit card tips that they cannot avoid a record of and some like Ms. Reardon who testified for the government are just writing down their credit card tips despite receiving cash tips (D-41) (Trial Day 1 Transcript p. 64 ll. 4-17) (Trial Day 3 Transcript p. 33 l.14 to p. 34 l. 13) (Trial Day 3 Transcript pp. 86-88).

27. Defendants attempted to record the tips, but the servers refused to accurately report them. (Trial Day 3 Transcript p. 33 l.14 to p. 34 l. 13) (Trial Day 3 Transcript pp. 86-88).

28. With the exception of Tyreek Williams and Francis Tepper, all of Plaintiff's witnesses were problem employees with reasons to be disgruntled. (Trial Day 3 pp. 46-50).

29. Defendants were compelled to provide an educated and approximate guess regarding

the cash tips, but only did so already knowing that the servers made well in excess of minimum wage. (Trial Day 3 pp. 86-88).

30. Defendants hired two separate professional payroll companies with regard to the payment of overtime to its employees and payment of the servers with the tip credit. (Trial Day 3 Transcript p. 33 l.14 to p. 34 l. 13) (Trial Day 3 Transcript p. 74) (Trial Day 3 Transcript p. 75 ll. 10-18) (Trial Day 3 Transcript pp. 94-96).

31. On the separate issue of how much over minimum wage to pay bussers, Ihsan Gunaydin made his own decision. Notably, this decision does not require an interpretation of legality under the FLSA, Ihsan knew what the minimum wage was through his professionals but used his own judgment to decide how much in excess of the minimum wage to pay to attract quality help. Paying over minimum wage does not implicate the FLSA in any way; there is no ceiling to be aware of, no notice or recordkeeping requirement.

32. Defendants hired and relied upon two separate professional certified public accountants. (Trial Day 3 Transcript p. 33 l.14 to p. 34 l. 13) (Trial Day 3 Transcript p. 74) (Trial Day 3 Transcript p. 75 ll. 10-18) (Trial Day 3 Transcript pp. 94-96).

33. Defendants did not interfere with the Wage and Hour investigation. (Trial Day 3 Transcript p. 44 ll. 2-25) (D-43 Columns B-Z l. 22) (only one witness of 25 claims asked to lie) (G-6).

34. Only one witness of the 25 originally interviewed by Martin said that they had been asked to lie by the employer. (D-43). Of the 25 witnesses for whom the Government has submitted statements as trial exhibits, only one was willing to say that the employer had asked them to lie. Given the number of employees who did not make

similar claims of interference, and the testimony by Defendants regarding the alleged interference, the weight of the evidence is against finding that Defendants interfered in the government's investigation. (D-43 columns B-Z l. 22) (G-6).

35. Of those few witnesses who said they were directed what to say to the government investigator, none suggested they were asked to misrepresent anything regarding their receipt of minimum wage or participation in the tip pool.

36. Defendants do not have a history of FLSA violations. (Trial Day 3 Transcript p. 35 ll. 3-18) (Trial Day 2 Transcript pp. 117-118).

37. Despite a visit by the Labor Department in 1999, Defendants were never informed that there was any issue with its payments or tip credits. Defendants were entitled to rely on the fact that, when the Department of Labor interviewed individuals and reviewed numerous documents in 1999, they would have notified Defendants of any violations, other than approximately sixty-four dollars of missed overtime payments. (Trial Day 3 Transcript p. 35 ll. 3-18) (Trial Day 3 Transcript pp. 94-96) (1999 Investigation Record – previously attached to Plaintiff's Motion for Summary Judgment as Exhibit R – attached hereto as Exhibit D).

38. The relevant provisions of the FLSA have not changed since 1999. *Compare* 29 U.S.C.A. § 203 Effective August 7, 1998 *to* 29 U.S.C.A. § 203 Effective March 23, 2018.

39. Empire diner did not change any pay policies or practices between 1999 and the DOL investigation that is at the heart of this case. (Trial Day 3 Transcript p. 73 l. 23 to p. 74 l. 1).

40. Moreover, Defendants' accountant, a CPA, never informed them of any issues. (Trial

Day 3 Transcript p. 74 ll. 3-14) (Trial Day 3 Transcript pp. 94-96).

41. In fact, the current CPA estimated that based on the level of credit card tips, if the servers were earning 20% of their tips in cash and 80% in credit card, they would earn at least $10 per hour, if they were earning 50% cash tips and 50% credit cards they were earning approximately $13-$15 per hour and if they were earning 80% cash tips and 20% credit cards they would have earned $20 per hour or more (Trial Day 3 Transcript pp. 119-121).

42. The Department of Labor sat on its alleged investigation for several months before finally deciding to claim that there was an issue with Defendants' payments.  Ten months of violations could have been avoided if the government had simply answered Empire's questions about whether it had any problems during the pendency of the investigation. (Trial Day 2 Transcript p. 170-172) (Trial Day 3 Transcript pp. 36-37).

43. Defendants tried to determine if there were major issues that needed to be rectified, but the government did not reveal the tip credit and tip pool notice and recordkeeping requirements to them to tell them until 10 months into the investigation at the final meeting. (Trial Day 2 Transcript p. 170-172) (Trial Day 3 Transcript pp. 36-37).

44. All monies the servers contributed to the tip pool were paid to the busboys in their paychecks; Empire never stole bussers tip money for its own uses. (Trial Day 3 Transcript p. 10 ll. 9-18) (Trial Day 3 Transcript p. 35 l. 19 to p. 36 l. 3).

45. Empire put the government on notice of the fact that busboy pay included the tips from the outset of its investigation. (Trial Day 2 Transcript p. 109 ll. 11-21).

46. Empire contributed its own salary money to bussers pay for each paycheck. (Trial Day 3 Transcript p. 35 l. 19 to p. 36 l. 3).

47. Empire never applied more than $4.42 credit for tips to any busser's pay; that is to say, Empire's own contribution to bussers' pay always exceeded the maximum tip credit amount. (Trial Day 3 Transcript p. 35 l. 19 to p. 36 l. 3).

### C.  DEFENDANTS ACTED IN GOOD FAITH AND REASONABLY

48. Mr. Martin testified that he thought getting the leadership of a CPA would show good faith under the Fair Labor Standards Act. (Trial Day 3 Transcript p.14 ll. 9-25).

49. Ihsan Gunaydin did not know that there needed to be written records, but if he had known, he would have kept them. (I.G. Dep. 67:4-6).

50. During the 1999 investigation, the Government never told Defendants that there was any ongoing violation nor provide any papers or other information indicating that Empire Diner was then engaging in violations of FLSA beyond a $64.46 overtime mistake. *See* Exhibit D.

51. Had the Government told Ihsan Gunaydin that Empire was doing something wrong, required certain changes, or was out of compliance, he absolutely would have done whatever it took to follow the laws. (I.G. Dep. 93:20-23).

52. The Government did none of these things.

53. Defendants in 1999 were only required to pay a nominal fee for a slight overtime miscalculation of payment. *See* Exhibit D.

54. There was a DOL investigation performed in 1999, which did not indicate any issue with notice, wage payments, or recordkeeping but rather only a $64.46 mistake in overtime with respect to two employees. *See* Exhibit D.

55. Defendants also took several affirmative steps to ensure that they were in compliance with all laws regarding payroll and wage payments afterwards. (Trial Day 3

Transcript p. 33 l.14 to p. 34 l. 13) (Trial Day 3 Transcript p. 75 ll. 10-18) (Trial Day 3 Transcript pp. 94-96) (Trial Day 3 Transcript p. 74) (Trial Day 2 Transcript 172 ll. 18-25):

    a.  Empire Diner hired and relied upon a professional payroll company who never informed them of any compliance issues.

    b.  Empire Diner hired a second professional payroll company who never informed them of any compliance issues.

    c.  Empire Diner engaged the services of, and relied upon a professional CPA, who never informed them of any compliance issues.

    d.  Empire Diner engaged the services of a CPA, and relied upon a second professional CPA, who never informed them of any compliance issues.

56. After the initial meeting with investigator Martin in May 2017, the Government waited for almost ten months until finally informing Empire Diner that they believed there were violations. (Trial Day 2 Transcript p. 170-172).

57. As soon as Defendants were advised that there were FLSA violations, they immediately took steps to rectify all alleged issues. (Trial Day 2 172 ll. 18-25).

58. Defendants made numerous changes, including the elimination of the tip pool the government challenged, the creation of a new system to record all tips wherein all servers were afterwards required to routinely complete a specific form to indicate all tips earned, implemented the thorough and complete recordkeeping the government challenged and, made explicit changes to the Employee Handbook as an "onboarding" document, ensuring proper notice under the law as instructed by the government, including notice to tipped employees where there is no employer-

required tip pool and notice to tipped employees participating in an employer-required tipped pool.

**D.  DEFENDANTS ARE NOW FULLY IN COMPLIANCE WITH THE FLSA**

59. Since being informed that the Government concluded there had been FLSA violations, Defendants have been in full compliance with the FLSA. (Trial Day 2 Transcript p. 172 ll. 18-25) (Exhibit D).

60. Defendants made numerous changes, including the elimination of the tip pool, the creation of a new system to record all tips wherein all servers are required to complete a specific form to indicate all tips earned, thorough and complete recordkeeping, changes made to the Employee Handbook as an "onboarding" document, which gives proper notice under the law, including notice to tipped employees where there is no employer-required tip pool and notice to tipped employees participating in an employer-required tipped pool. (Trial Day 3 Transcript p. 40 l. 16 to p. 41 l. 16) (Trial Day 2 Transcript p. 172 ll. 18-25).

61. After putting Empire's payroll under the microscope Plaintiff was only able to find an underpayment of approximately $473 to 6 people in the period after Empire made changes to meet the law. G-33.

62. Defendants did not keep a record of it, but if Ihsan Gunaydin had known a record had to be kept of it, they would have. (I.G. Dep. 67:4-6).

63. In 1999, the Labor Department came to Empire Diner but did not say anything. (I.G. Dep. 91:1-2). Nothing happened. (I.G. Dep. 91:3).

64. All information requested was given, the government representative spoke to each employee for approximately 10-15 minutes, looked over all the paperwork for two

days, and never said anything more after that. (I.G. Dep. 91:5-13; 92:15-20).

65. The government did not give any information or papers to indicate that Empire Diner was committing any violations. (I.G. Dep. 92:21-24).

66. If Empire had been told that they were doing something wrong and was showed the correct way, Ihsan would have ensured that everything was done the correct way and in accordance with the rules. (I.G. Dep. 93:20-23).

67. The government did not tell Empire Diner to make any changes at any time during the 1999 investigation. (I.G. Dep. 94:6-7).

## II.    PROPOSED CONCLUSIONS OF LAW

### A.  ENGIN GUNAYDIN IS NOT AN EMPLOYER UNDER SECTION 3(d) OF THE FAIR LABOR STANDARDS ACT

1. Although the United States Court of Appeals for the Third Circuit has not addressed the issue, other Courts of Appeals have held that a corporate officer may be deemed to be an "employer" under the FLSA and held jointly and severally liable for unpaid wages. *See Chao v. Hotel Oasis, Inc.,* 493 F.3d 26, 34 (1st Cir.2007); *Agnew,* 712 F.2d at 1511; *Grim Hotel Co.,* 747 F.2d 966, 971–72 (5th Cir.1984) (quoting *Agnew*). These courts have held that the "economic reality" test also governs the analysis for determining whether individuals are employers under the FLSA, but focuses on "the role played by the corporate officers in causing the corporation to undercompensate employees and to prefer the payment of other obligations and/or the retention of profits." *Baystate Alternative Staffing, Inc. v. Herman,* 163 F.3d 668, 678 (1st Cir.1998).

2. When considering the question of whether an individual is an employer under Section 3(d) of the Fair Labor Standards Act: "In addition to analyzing corporation

14

administration in determining FLSA employer liability, courts also look to whether an

individual exerts 'substantial control' over its operation." *Wright v. Lehigh Valley

Hosp. & Health Network*, No. CIV.A. 10-431, 2011 WL 2550361, at *2 (E.D. Pa.

June 23, 2011) (citing *Falk v. Brennan*, 414 U.S. 190, 195, 94 S.Ct. 427, 38 L.Ed.2d

406 (1973)); *see also Reich v. Circle C Inv. Inc*., 998 F.2d 324, 329 (5th Cir.1993)

(noting that defendant was the "driving force" behind the corporation and thus met

the definition of an employer).

    a.   Engin Gunaydin does not exert substantial control over Empire.

    b.   Engin Gunaydin is not the driving force behind Empire.

3.   "The factors deemed relevant to the personal liability analysis include the officer's

(1) ownership interest in the corporation, (2) degree of operation control over the

corporation's daily functions, financial affairs, and compensation practices, and (3)

role in the corporation's determination to compensate (or not compensate) employees

in accordance with the FLSA." *Wright v. Lehigh Valley Hosp. & Health Network*, No.

CIV.A. 10-431, 2011 WL 2550361, at *2 (E.D. Pa. June 23, 2011)

    a.   Engin Gunaydin has no ownership interest in Empire

    b.   Engin Gunaydin has no control over the financial affairs and compensation

       practices of Empire and collaborates with his father on those issues of daily

       control with which he is involved.

    c.   Engin Gunaydin has no role in Empire's determination to compensate (or not

       compensate) employees in accordance with the FLSA.

4.   In a case that some Western District of Pennsylvania Courts have cited on the issue of

the personal liability of individuals under the FLSA, but where in actuality the Third

15

Circuit was presented only with the issue of determining the joint liability of business entities as co-employers and does not seem to have ever addressed individual liability under the Act, the Court of Appeals acknowledged the flexibility of the definition of "employer" and adopted the four following factors: "(1) authority to hire and fire employees; (2) authority to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (3) day-to-day supervision, including employee discipline; and (4) control of employee records, including payroll, insurance, taxes, and the like." *In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 683 F.3d 462, 468 (3d Cir. 2012).

    a.   Engin Gunaydin does not have the authority to hire and fire employees without consulting his father who makes the final decision.

    b.   Engin Gunaydin does not have the authority to set conditions of employment including compensation, benefits and hours.

    c.   Engin Gunaydin has involvement in day-to-day supervision, but only as an ordinary manager who looks to Ihsan Gunaydin for final authority in all matters of importance.

    d.   Engin Gunaydin does not have control or custody of employee records including payroll, insurance, taxes and the like.

5. The factors relevant to the personal liability analysis all weigh against finding that Engin Gunaydin was an employer.

6. Defendant Engin Gunaydin is not an "employer" under Section 3(d) of the Fair Labor Standards Act, 29 U.S.C. § 203(d) ("FLSA").

7.  Because he is not a Section 3(d) employer, Defendant Engin Gunaydin also cannot be individually liable under Section 3(d) of the FLSA.

**B.   DEFENDANTS DID NOT WILLFULLY VIOLATE THE FLSA ALLOWING THE DAMAGES PERIOD TO BE EXTENDED FROM TWO TO THREE YEARS**

8.  Defendants did not willfully violate the FLSA.

9.  "The Supreme Court set forth the standard which determines whether violations of the FLSA are willful in *McLaughlin v. Richland Shoe Co*., 486 U.S. 128 (1988)." *Acosta v. Heart II Heart, LLC*, No. 2:17-CV-1242, 2019 WL 5197329, at *8 (W.D. Pa. Oct. 15, 2019) (citing *Richland Shoe Co*., 486 U.S. 128 (1988)). In *Richland Shoe*, the Court held that an employer "willfully" violated the Act when it "knew or showed reckless disregard for the matter of whether its conduct was prohibited" by the FLSA. *Id.*

10. Plaintiff presented no evidence that Defendants knew prior to the current investigation that Empire was required to give specific notice to the servers regarding the tip credit or that there were specific recordkeeping requirements flowing from their taking the tip credit or having a tip pool.

11. Plaintiff presented no evidence that any employee had ever complained to Empire about a violation of the FLSA regarding Tip Credit or Tip pool, or anything else.

12. Defendants were not reckless in regard to the matter of whether their conduct was prohibited by the FLSA where they relied on not changing their practices after a prior DOL visit where the DOL found no fault with their tip credit notice or tip pool recordkeeping procedures, and where they subsequently relied on the advice of two separate payroll companies they hired and two separate CPA's they hired to

administer Empire Diner's payroll that never notified them of any problem with the

policies and procedures of taking the tip credit or having a tip pool.

13. Willfulness requires a showing that the employer "knew" its conduct was prohibited

by the FLSA or "showed reckless disregard for the matter." *McLaughlin v. Richland

Shoe Co.*, 486 U.S. 128 (1988); *Bey v. Dynamic Computing Servs. Corp.*, No. 3:18-

CV-00120 JWS, 2019 WL 8226486, at *2 (D. Alaska Dec. 19, 2019) (citation

omitted).

14. Acting unreasonably with regard to one's legal obligations under the FLSA is not

enough. *See id*. Rather, willfulness requires some actual awareness of the potential

FLSA violation, not just of the FLSA in general, and a failure to adequately ensure

compliance. *See McLaughlin v. Richland Shoe Co*., 486 U.S. 128 (1988).

15. Defendants acted reasonably when they relied on continuing the practices and

procedures which the DOL approved in 1999, continued to conduct the tip credit and

tip pool payroll activities in the same manner the DOL approved in 1999 without

change through the current investigation, and where they hired two separate payroll

companies and two separate CPAs to handle payroll for them that never notified them

of any problem with the policies and procedures of taking the tip credit or having a tip

pool.

16. "Mere knowledge of the FLSA and its potential applicability does not suffice, nor

does conduct that is merely negligent or unreasonable." *See Souryavong v.

Lackawanna County,* 872 F.3d 122, 126-127 (3d Cir. 2017);*Treadway v. Otero*, No.

2:18-CV-259, 2020 WL 806669, at *2 (S.D. Tex. Jan. 29, 2020), report and

recommendation adopted, No. 2:18-CV-259, 2020 WL 777303 (S.D. Tex. Feb. 18,

2020) (citations omitted).

17. "An employer who 'act[s] without a reasonable basis for believing that it was
complying with the [FLSA] is merely negligent" as is an "employer who fails to seek
legal advice regarding its payment practices." *Treadway v. Otero*, No. 2:18-CV-259,
2020 WL 806669, at *2 (S.D. Tex. Jan. 29, 2020) (citations omitted); *see also*
*Pignataro v. Port Auth. of New York & New Jersey*, No. 04-CV-1767DMC, 2008 WL
2625356, at *2 (D.N.J. June 27, 2008) (The term "willful" "is generally understood to
refer to conduct that is not merely negligent.").

18. To find willfulness, the evidence must demonstrate "an employer actually knew its
pay structure violated the FLSA or ignored complaints that were brought to its
attention." *Treadway v. Otero*, No. 2:18-CV-259, 2020 WL 806669, at *2 (S.D. Tex.
Jan. 29, 2020).

19. Plaintiff presented no evidence that Empire actually knew its pay structure violated
the FLSA or that it ignored complaints brought to its attention.

20. Willful violations of the FLSA require a specific awareness of having the legal issue.
*Souryavong v. Lackawanna County*, 872 F.3d 122, 126-127 (3d Cir. 2017) (citing
*Flores v. City of San Gabriel*, 824 F.3d 890, 896, 905–07 (9th Cir. 2016)).

21. Plaintiff presented no evidence that any employee ever brought a complaint about
violation of the FLSA to Defendants' attention or that Empire had any other reason to
know its tip credit notice or tip pool recordkeeping were problematic under the FLSA.

22. Plaintiff presented no evidence that Defendants had any knowledge of the existence
of an FLSA tip credit or tip pool, notice or recordkeeping violation prior to the
current investigation.

23. "An employer who makes a 'good-faith but incorrect assumption that a pay plan complied with the FLSA' does not commit a willful violation." *Id.*

24. Importantly, the Supreme Court of the United States has stated, "that Congress did not simply extend the limitations period to three years, but instead adopted a two-tiered statute of limitations, makes it obvious that ***Congress intended to draw a significant distinction between ordinary violations and willful violations*****.**" *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 132, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988)(emphasis added).

25. Defendants' violations are ordinary and do not rise to the level of willfulness required to extend the statute of limitations.

26. The term 'willful' "is generally understood to refer to conduct that is not merely negligent." "To find willfulness, the evidence must demonstrate an employer actually knew its pay structure violated the FLSA or ignored complaints that were brought to its attention," and. [a]n employer who makes a 'good-faith" but incorrect assumption that a pay plan complied with the FLSA does not commit a willful violation." *Pignataro v. Port Auth. of New York & New Jersey*, No. 04-CV-1767DMC, 2008 WL 2625356, at *2 (D.N.J. June 27, 2008).

27. Defendants' failure to maintain pristine records does not demonstrate that their actions rose to the level of willfulness. Notably, the Secretary made this same exact argument in *Acosta v. Osaka Japan Rest., Inc*., No. CV 17-1018, 2018 WL 3397337, at *13 (E.D. Pa. July 12, 2018), that "Defendants' poor recordkeeping practices "corroborate willfulness"—in essence, that Defendants willfully violated core provisions of the FLSA, including its recordkeeping requirements, and covered their

tracks by discarding records." The *Osaka* Court noted that the record suggested that Defendants in that case were "as ignorant about the recordkeeping requirements as they were about the minimum wage and overtime requirements, and discarded records simply because they thought they didn't need to keep them." *Id.* Thus, the *Osaka* Court denied the Secretary's motion with respect to the issue of willfulness.

28. Defendants here were as ignorant about the recordkeeping requirements as they were about the minimum wage and overtime requirements, and discarded records simply because they thought they did not need to keep them.

29. Defendants did not interfere with the Wage and Hour investigation.

30. Defendants are not repeat offenders.

31. The Government must demonstrate something more than mere awareness of the statute to prevail on the willfulness issue. *Pignataro* 2008 WL 2625356, at *2. It has not.

32. Defendants' lack of willful behavior is strikingly similar to the situation in *Acosta v. Osaka Japan Rest., Inc*., No. CV 17-1018, 2018 WL 3397337, at *12 (E.D. Pa. July 12, 2018). In *Osaka*, Defendants gave testimony at deposition regarding their lack of knowledge regarding legal requirements for minimum wage and overtime. *Id.* The Court held that, in light of such testimony, "a reasonable jury could find that these violations were not willful, particularly prior to the federal investigation." *Id.* At the summary judgment stage, the Court held that such facts did "not support a finding that Defendants acted with actual knowledge or reckless disregard for the unlawfulness of their conduct. To the contrary, it appeared that [the defendant employer] was a not especially sophisticated small business owner – just the sort of

"ignorant" employer who, under *McLaughlin*, did not act willfully." *See id.; see also*

*Souryavong v. Lackawanna Cty.*, No. 3:CV-13-1534, 2015 WL 3409472, at *7 (M.D.

Pa. May 27, 2015) (holding that plaintiff failed to demonstrate that violation was

willful where plaintiff argued that defendant knew about the FLSA and its

requirements, but defendant disputed such knowledge).  In this case, Plaintiff has not

ever argued that Empire knew about the FLSA notice and/or recordkeeping

requirements.

33. The actions of Defendants were not willful, but rather, resulted from inexperience,

incompetence or negligent behavior that in no way rises to the level of willful

misconduct. *See Acosta v. Heart II Heart, LLC*, No. 2:17-CV-1242, 2019 WL

5197329, at *8 (W.D. Pa. Oct. 15, 2019) (genuine issue of material fact existed as to

employer's willfulness and denying summary judgment on this issue); *Stone v. Troy*

*Construction, LLC*, 935 F.3d 141 (3d Cir. 2019) (genuine dispute of material fact

remained as to employer's willfulness).

34. Defendant's failure to give notice and keep tip credit records in accordance with

FLSA resulted from inexperience, incompetence or negligent behavior that in no way

rises to the level of willful misconduct.

35. Defendants acted in good faith and absent any willful or wrongful misconduct, and

there is no reason nor justification to extend the back-wage period by an additional

year.

36. Under 29 U.S.C. § 259, an employer is not liable if he can prove that "the act or

omission complained of was in **good-faith** in conformity with and in **reliance** on any

written administrative regulation order, ruling, approval, or interpretation" of the "the

22

Administrator of the Wage and Hour Division of the Department of Labor." *Id.*

37. Defendants were not willful because they relied on conformity with a prior DOL
approval of its practices.

38. In light of the Supreme Court's holding that there is a significant distinction between
ordinary violations and willful violations, Plaintiff must show more than the facts
underlying his claims that the FLSA was violated in order to show the three-year
period applies. *Korndobler v. DNC Parks Resorts at Sequoia*, 2015 WL 3797625 at
*7 (EDCA June 18, 2015(citing *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128,
130, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988).

39. In seeking to show willfulness Plaintiff has done no more than demonstrate the
recordkeeping and notice violations upon which the Court's Summary Judgment
decision was sought by Plaintiff and granted.

40. Reliance on a clean bill of health by a prior department of labor investigation, even
one which did not specifically question the problem in the later case is grounds to say
no willfulness where the employer relied upon the finding of good health in the prior
investigation and the law had not changed.  *Marshall v. Roots Restaurant, Inc.,* 667
F.2d 559, 561 (6th Cir. 1982).

41. The Government has not shown that the FLSA sections regarding tip credit notice and
tip pooling recordkeeping requirements have changed in any relevant way with
respect to the violations of notice and recordkeeping requirements upon which the
Secretary's Judgment was granted.

42. Even if the Court finds Empire's actions unreasonable; Acting only "unreasonably" is
insufficient for a finding of willfulness — some degree of actual awareness (or

recklessness) is necessary. *Souryavong v. Lackawanna Cty*., 872 F.3d 122, 127 (3d

Cir. 2017); *Lugo v. Farmers Pride*, 802 F.Supp. 2d 598, 618-19 (EDPA 2011)(J.

Baylson)(citing McLaughlin at 135.

43. To be willful, An FLSA violation must have a degree of egregiousness akin to

manipulation and concealment. *Souryavong v. Lackawanna Cty*., 872 F.3d 122, 126-

127 (3d Cir. 2017)("there is a jury question on willfulness if a family fails to pay a

nanny a minimum wage, family testimony indicates the family "knew" about

minimum wage laws, and the nanny's testimony was that the family required her to

work twice as many hours as the family claimed, did not provide a contract or record

her working hours, and instructed her to lie about her employment.")(citing the fact

pattern in *Davila v. Menendez*, 717 F.3d 1179, 1182–83, 1185 (11th Cir. 2013)).

44. The recordkeeping and notice violations by Defendants are not egregious and do not

have egregiousness akin to manipulation or concealment like in *Davila*.

45. Plaintiff has not shown any voluntary, deliberate, or intentional violations of the

FLSA notice and recordkeeping provisions upon which the judgment in their favor is

based.

## C. AN AWARD OF LIQUIDATED (DOUBLE) DAMAGES IS NOT WARRANTED HERE BECAUSE DEFENDANTS' ACTIONS WERE TAKEN IN GOOD FAITH, AND THEY HAD REASONABLE GROUNDS FOR THE BELIEF THEY WERE COMPLYING WITH THE FLSA.

46. "[I]f the employer shows to the satisfaction of the court that the act or omission

giving rise to such action was in good faith and that he had reasonable grounds for

believing that his act or omission was not a violation of the [FLSA], the court may, in

its sound discretion, award no liquidated damages or award any amount thereof not to

exceed the amount specified in section 216 of this title." 29 U.S.C. § 260.

47. Good faith "is an affirmative defense to paying [liquidated] damages if the employer can demonstrate that its conduct or omission giving rise to the lawsuit 'was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act.'" *Rudy v. City of Lowell*, 777 F. Supp. 2d 255, 262–63 (D. Mass. 2011) (quoting 29 U.S.C. § 260).

48. Specific inquiry into the FLSA is not required for a finding of good faith. *Brooks v. Village of Ridgefield Park*, 185 F.3d 130, 139 (3d Cir. 1999).

49. One formulation of the good faith standard in the third circuit is the defendant was objectively and reasonably entitled to believe that its actions do not controvert the law. *Brooks v. Village of Ridgefield Park*, 185 F.3d 130, 139 (3d Cir. 1999).

50. Defendants were objectively and reasonably entitled to believe their actions did not controvert the FLSA where they relied on a prior DOL investigation, a series of professionals including two payroll companies and two CPAs and where there was never an employee complaint of FLSA violation brought to their attention.

51. Even Historical compliance with government agencies **other** than the DOL on same issue are sufficient to show good faith. *Blan v. Classic Limousine Transportation, LLC*, 2021 WL 1176063 (WDPA March 29, 2021).

52. Defendant's compliance with the findings of the 1999 investigation of the DOL itself demonstrate good faith.

53. The employer avoids liquidated damages where it can show both that it had "an honest intention to ascertain and follow the dictates of the FLSA," and that it "**act[ed] as a reasonably prudent man would have acted under the same circumstances.**" *Brooks v. Village of Ridgefield Park*, 185 F.3d 130, 137 (3d Cir. 1999)(emphasis

added).

54. Defendants showed an honest intention to ascertain and follow the dictates of the
    FLSA when they continued the policies and procedures with respect to Payroll that
    the DOL signed off on in its 1999 instruction and when they hired a series of
    professionals in the area of payroll including two payroll companies and two CPAs to
    oversee the process for them.  Defendants acted as reasonably prudent men when they
    hired professionals with expertise in the area of payroll to manage the payroll system
    for them.

55. The evidence demonstrates that Defendants acted in good faith and under the
    reasonable belief that they were in compliance with all labor and employment laws.

56. It was reasonable for Defendants to believe, in good faith, that they had been
    operating fairly and lawfully.

57. Liquidated damages are not appropriate against Defendants.

58. Given that Defendants acted in good faith and had reasonable grounds for believing
    they were not committing violations of the FLSA, liquidated damages are not
    appropriate.

59. Since Defendants were not willful justifying a three-year damages period and since
    Defendants acted in good faith and had reasonable grounds for believing they were
    not committing violations of the FLSA, obviating liquidated damages, the total
    amount of back wages owed by Defendants for the appropriate two-year period of
    January 12, 2016 through January 14, 2018 is $418,635.44.  This includes
    $400,482.74 with respect to alleged Section 6 minimum wage violations and
    $18,152.70 with respect to alleged Section 7 overtime violations.  The Court

respectfully should award no damages for broken plates, or even if the government's evidence is fully believed, adjust the breakage fee downward from one plate per week per employee to a number reflecting the trial testimony of the government witnesses. 3 witnesses with 42 years Empire Employment combined had never been charged for a plate.

## D.  INJUNCTIVE RELIEF IS INAPPROPRIATE

60. Defendants are in compliance with the FLSA's requirements and have demonstrated a complete willingness to respond to any government instruction to date, moreover, their prior pay practices are being charged by at least $418,635.44 in money damages and the avoidance of future money damages is a significant deterrent to any future transgression of the labor law by Empire.

Respectfully submitted,

By:      */s/ James A. Bell, IV*
James A. Bell IV
Attorney ID No. 81724
Christopher A. Macey, Jr.
Attorney ID No. 207800
Bell & Bell LLP
One Penn Center
1617 JFK Blvd. – Suite 1254
Philadelphia, PA 19103

*Attorneys for Defendants*

Dated: June 6, 2022