IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PATRICK PIZZELLA,                    :    CIVIL ACTION
                                     :    NO. 18-4663
          Plaintiff,                 :
                                     :
     v.                              :
                                     :
EMPIRE DINER, et al.,                :
                                     :
          Defendants.                :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          August 18, 2022

## I.    INTRODUCTION

Patrick Pizzella, former acting Secretary of Labor ("Plaintiff"), brings this action under the Fair Labor Standards Act (the "FLSA") against Empire Diner, Ihsan Gunaydin, and Engin Gunaydin (collectively "Defendants"), for violations of the FLSA's minimum wage, overtime, and recordkeeping requirements.

Empire Diner ("Empire") is a 24-hour restaurant in Lansdowne, Pennsylvania. At all times relevant to this action, Ihsan Gunaydin ("Ihsan") was the owner of Empire Diner, and Engin Gunaydin ("Engin") worked as a manager at the diner. The diner employs, inter alia, servers, kitchen workers, bussers, and cashiers.

On August 10, 2017, a Wage and Hour ("WH") investigation began at Empire. The WH investigation continued until May 3, 2018, when WH Investigator Gyasi Martin convened a final

conference with Ihsan, Engin, and Certified Public Accountant
Ali Gunaydin.

On October 30, 2018, Plaintiff filed a complaint alleging
that Defendants violated the FLSA and seeking injunctive relief
and a judgment against Defendants consisting of back wages and
liquidated damages. After discovery, the parties filed cross
motions for summary judgment. The Court denied Defendants'
motion in full. Plaintiff's motion was granted as to the
liability of Defendants Ihsan and Empire for minimum wage,
overtime, and recordkeeping violations. The Court declined to
enter summary judgment in favor of Plaintiff as to the following
issues: (1) whether Engin is an employer under the FLSA; (2)
whether Defendants acted willfully, which, in turn, would affect
(3) the amount of back wages owed; (4) the imposition of
liquidated damages; and (5) whether Plaintiff was entitled to
injunctive relief.

The Court held a bench trial on the five issues that
remained in the case after summary judgment. This memorandum
constitutes the Court's findings of fact and conclusions of law.
For the reasons set forth below, the Court concludes that Engin
Gunaydin was an employer under the FLSA, that Defendants'
violations of the FLSA were willful, that Defendants are liable
for $675,626.67 in back wages and an equal amount in liquidated
damages, and that injunctive relief is warranted.

2

## II.  FINDINGS OF FACT

### A.  Engin's Employment with Empire

Engin is Ihsan's oldest son. See Tr. of Trial on 03/29/2022 ("Day 3 Tr.") 26:16-17, ECF No. 91.[1] While Engin held no formal ownership interest in Empire, he and Ihsan were jointly responsible for operating the diner and setting general work policies. See Day 3 Tr. 54:15-21. When Ihsan traveled to Turkey, which generally occurred multiple times per year, Engin was left in charge of Empire. See id. at 59:3-5. And while Ihsan generally ordered food and supplies for the restaurant, Engin took over that responsibility when Ihsan was unavailable. See id. at 51:11-18.

As Empire's manager, Engin was primarily responsible for interviewing and hiring front-of-the-house employees such as servers and bussers. Tr. of Trial on 02/22/22 ("Day 1 Tr.") 41:10-16, ECF No. 78; Day 1 Tr. 97:2-4 (server testifying that "[Engin] talked to me for . . . a few minutes about the job, and then he hired me."); Frazer Decl. ¶ 3, Pl.'s Trial Ex. 40; Williams Decl. ¶ 3, Pl.'s Trial Ex. 48; Sheeran Decl. ¶ 3, Pl.'s Trial Ex. 46, Tepper Decl. ¶ 3, Pl.'s Trial Ex. 42. Ihsan testified in his deposition that he only hired servers "when [Engin's] not there." Ihsan Dep. 34:21-22, ECF No. 40-8. Engin

---

[1]     Empire's Certified Public Accountant, Ali Gunaydin, is also Ihsan's son. See Day 3 Tr. 99:7-8.

was also tasked with training new employees when necessary. See
Day 3 Tr. 52:2-10; Engin Dep. at 15:12-20, ECF No. 40-9.

Engin worked together with Ihsan to set work schedules for
Empire's employees. See Day 3 Tr. 52:14-17; Tr. of Trial on
04/07/22 ("Day 4 Tr.") 18:18-25, ECF No. 92. When servers needed
to change their schedule, they would ask Engin for approval. See
Day 1 Tr. 42:21-22. And when Empire needed employees to work
overtime, Engin called them in to work. See Day 1 Tr. 116:8-11,
191:11-14. Engin and Ihsan shared the responsibility of
assigning employees to their workstations for each shift. See
Day 3 Tr. 52:22-53:4, 53:9-11.

Engin disciplined employees at Empire. See Day 1 Tr. 43:5-
7, 55:6-10. Such discipline included removing employees from the
schedule, yelling at them, firing them, reducing their scheduled
hours, and assigning them to undesirable workstations. See id.
at 55:11-18.

When Engin hired new servers, he told them they would be
paid $2.83 per hour plus tips. See Day 1 Tr. 169:19-20; Engin
Dep. at 16:5-10. Engin and Ihsan worked together on payroll
duties such as collecting timecards and sending records of
employee time sheets and tips to Empire's payroll company. Day 3
Tr. 55:22-24, 56:19-24, 57:7-17. Engin and Ihsan both
distributed paychecks to Empire's employees. Id. at 57:7-9. One
server testified that, at least on occasion, she received her

4

paychecks in the form of a personal check signed by Engin. Day 1 Tr. 116:21-117:12.

### B.   Defendants' Pay Policies

Defendants paid an hourly wage to servers, bussers, kitchen employees, and cashiers. See Tr. of Trial on 03/02/2022 ("Day 2 Tr.") 21:1-5, ECF No. 81. Defendants paid servers a wage of $2.83 per hour, see Pl.'s Trial Ex. 2, and allowed them to keep a portion of the tips earned for each shift. Day 1 Tr. 41:25-42:5.[2]

At all times relevant to this action, the federal minimum wage was $7.25 per hour. See 29 U.S.C. § 206(a). Defendants never informed servers that they were entitled to the minimum wage under federal law. See Day 1 Tr. 101:10-21, 115:9-18, 143:15-20, 156:7-9, 168:18-23; Day 2 Tr. 12:22-13:3.

### 1.   Tip Practices

Defendants paid servers a wage of $2.83 per hour. See Pl.'s Trial Ex. 2. Defendants also allowed servers to keep a portion of the tips they received from customers. See Day 1 Tr. 41:25-

---

[2]     Several witnesses testified at trial that Defendants deducted money from their paychecks if they broke a dish. However, the Court finds the testimony on this alleged practice too inconsistent, both as to the frequency with which such charges occurred and to the amount charged, to form the basis for any factual findings. See Day 1 Tr. 165:25-166:5, 174:3-5 (testimony from 32-year employee of Empire that she was charged once for a broken dish but is not aware of anyone else ever being charged); Day 1 Tr. 58:15-18 (13-year Empire employee testifying that she was never charged for plate breakage); Day 1 Tr. 154:24-25 (testimony from 9-year Empire employee who was never charged for plate breakage); Day 1 Tr. 91:2-7, 155:3-8, 174:6-9 (former employees testifying that Defendants charged $10, $5, and $20, respectively, per broken plate).

42:5. However, Defendants also required servers to turn over
anywhere from ten to fifteen percent of the tips they earned
after each shift to either Engin or the employee working at the
cash register. See Day 1 Tr. 44:10-19, 98:22-99:14, 112:19-
113:5, 139:7-9, 153:15-20, 183:16-22; Day 2 Tr. 10:20-11:5,
32:10-13, 38:18-23; Day 3 Tr. 61:2-7. If servers failed to turn
over the requisite percentage of their tips after their shift,
Engin—or a cashier under Engin's direction—would require them to
give a greater percentage on their next shift. See Day 1 Tr.
52:11-19, 154:11-16. Defendants used the tips that servers
turned over to them to pay the bussers' hourly wage. See Day 2
Tr. 46:3-10; Day 3 Tr. 64:21-25.

The tips Defendants collected from servers were placed in a
box under the cash register. See Day 3 Tr. 80:22-24. The cashier
would then record the amount each server turned over on a piece
of paper, which the cashier left in a drawer at the register
after every shift. See Engin Dep. 44:7-13; Day 1 Tr. 50:23-
51:17. Though these amounts were written down after every shift,
Defendants did not preserve these records. See Day 3 Tr. 12:16-
19; Engin Dep. 44:14-20.

Before the start of the WH investigation, Defendants did
not require servers to keep any record of all the tips they
received, nor did Defendants keep any such record themselves.
See Day 1 Tr. 48:15-22, 139:10-13, 153:24-154:3, 167:22-168:4,

6

184:10-13; Day 2 Tr. 11:6-10. Despite Defendants' failure to keep records of the tips received by servers, their payroll records always reported that each server received a total $7.63 per hour. See Day 2 Tr. 88:10-89:15; Day 3 Tr. 86:25-87:3. This number was not based on any concrete record of actual tips received, but was a "guesstimate" employed by Ihsan. Ihsan Dep. 76:21-77:2; see also Day 3 Tr. 88:9-13. Ihsan reported this estimated number in order to give the appearance that the servers all made over minimum wage. See Day 3 Tr. 86:20-87:3. Ihsan never consulted Empire's accountant about this practice. See id. at 87:9-12.

### 2. Overtime Practices

During the period relevant to the instant action, many of Empire's employees—including servers, bussers, and kitchen staff—worked over forty hours in certain weeks. See Day 1 Tr. 103:8-11, 116:14-16, 139:19-22, 157:12-14, 191:15-17; Day 2 Tr. 30:5-9, 35:2-4; see also Williams Decl. ¶¶ 25-26, Pl.'s Trial Ex. 48 (employee's statement that "all cooks worked in excess of fifty hours per workweek"). Defendants did not pay their employees time-and-a-half pay for overtime hours worked. See Mem. Op. at 15, ECF No. 47 (finding that Defendants failed to comply with the overtime pay requirements of the FLSA).

When hourly employees worked over forty hours per week, Defendants paid them in cash for the portion of their hours that

exceeded forty. See Day 1 Tr. 103:23-104:10, 116:17-25; Pl.'s Trial Ex. 24; Sheeran Decl. ¶ 11, Pl.'s Trial Ex. 46; Pl.'s Trial Ex. 48 ¶ 29. These cash payments represented the number of overtime hours worked times the employees' standard hourly rate of pay. See Day 1 Tr. 104:7-10, 116:17-24; Pl.'s Trial Ex. 24, Pl.'s Trial Ex. 46 ¶ 10; Pl.'s Trial Ex. 48 ¶ 31. Defendants kept no records of these cash payments. See Day 2 Tr. 96:14-18.

### C.   The WH Investigation

On August 10, 2017, WH Investigator Martin began his investigation into Defendants' pay practices.[3] See Day 2 Tr. 18:6-9. Thereafter, Engin told a group of Empire employees about the investigation. See Day 1 Tr. 43:13-18; Day 2 Tr. 10:8-19, 38:24-39:8.

After the investigation began, Engin directed a number of Empire employees to tell Martin that bussers only worked on weekends. See Day 1 Tr. 43:19-44:5, 167:14-21; Day 2 Tr. 38:24-39:8. However, testimony at trial established that bussers worked at Empire every day of the week. See Day 1 Tr. 44:7, 106:17-22; 167:10, 185:6-9; Day 2 Tr. 38:24-39:19.

---

[3]   Defendants urge the Court to find facts related to a 1999 WH investigation of Empire's pay practices. However, the discussion of this investigation at trial was insufficient to allow the Court to determine the investigation's scope, the precise outcome of the investigation, or Defendants' pay practices at that time (nearly twenty years prior to the filing of this action). The Court accordingly declines to consider the 1999 WH investigation in its disposition of this case.

Engin also told certain employees to tell Martin that they
never worked over forty hours in a workweek. See Day 2 Tr.
38:24-39:8; Day 1 Tr. 160:1-3; Pl.'s Trial Ex. 46 ¶ 25. The day
after the investigation began, Ihsan instructed one employee to
keep two separate timecards: one timecard to record the hours
she worked up to forty hours, and another—hidden up on a shelf
in the kitchen—that she would use to record any hours over
forty. See Day 1 Tr. 157:15-158:1; Pl.'s Trial Ex. 46 ¶¶ 26-27.
Ihsan told another employee that he "should not clock in any
hours over forty." Day 1 Tr. 147:10-20; Pl.'s Trial Ex. 48 ¶ 32.

### D.   Defendants' Conduct Following the Investigation

On May 3, 2018, WH investigator Martin held a final
conference with Ihsan, Engin, and Ali. Martin Decl. ¶ 19, Pl.'s
Trial Ex. 49. At that conference, Martin explained that his
investigation into Defendants had uncovered violations of the
FLSA's minimum wage, overtime, and recordkeeping violations. See
Day 2 Tr. 60:25-61:6. Martin also provided Ihsan, Engin, and Ali
with materials explaining the FLSA's regulations to assist them
in complying with the Act in the future. See id. at 58:23-59:3.

Defendants later provided Martin with additional payroll
records for a period after the May 3, 2018 final conference. See
id. at 62:2-5. Upon review of these records, Martin found that
Defendants had continued to violate the FLSA's minimum wage and

overtime requirements even after the conclusion of the WH investigation. See id. at 62:2-66:10.

### E.   Back Wages Calculation

Prior to the filing of this action, the parties signed an agreement to toll the statute of limitations from November 29, 2017, to November 1, 2018. See Day 1 Tr. 35:6-18. Plaintiff filed the instant complaint on October 30, 2018. See ECF No. 1.

While the parties disagree on the precise method the Court should use to calculate back wages in this case, they agree that the records contained within Plaintiff's Trial Exhibit 2 are accurate payroll records from which the award should be calculated. See Defs.' Resp. at 10, ECF No. 98 ("Defendants maintain that Plaintiff has entered a spreadsheet into evidence with all of the needed evidence."). The Court accordingly finds that these records are accurate and adopts them for the purpose of calculating the damage award.

### III. CONCLUSIONS OF LAW AND DISCUSSION

### A.   Engin Gunaydin is an Employer Under the FLSA

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." Falk v. Brennan, 414 U.S. 190, 195 (1973) (quoting 29 U.S.C. § 203(d)). The Third Circuit has recognized that the FLSA's definition of "employer" is "the broadest definition that has ever been included in any one act." In re Enterprise Rent-A-

Car Wage & Hour Emp. Pracs. Litig., 683 F.3d 462, 467-68 (3d Cir. 2012) (quoting United States v. Rosenwasser, 323 U.S. 360, 363 n.3 (1945)). Courts utilize the "economic reality" test for determining whether individuals are employers under the FLSA. See id. at 467. "Economic reality" depends on the "totality of the circumstances" rather than on the rigid "technical concepts of the employment relationship." Haybarger v. Lawrence Cnty. Adult Prob. & Parole, 667 F.3d 408, 418 (3d Cir. 2012) (quoting Hodgson v. Arnheim & Neely, Inc., 444 F.2d 609, 612 (3d Cir. 1971), rev'd on other grounds, 410 U.S. 512 (1973)). "[S]ignificant control" is sufficient to establish employer status; ultimate control is not required. Enterprise, 683 F.3d at 468.

The Third Circuit acknowledged the flexibility of the FLSA's "employer" definition by adopting four non-exhaustive factors: "(1) authority to hire and fire employees; (2) authority to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (3) day-to-day supervision, including employee discipline; and (4) control of employee records, including payroll, insurance, taxes, and the like." Id. at 469. The Third Circuit stressed that the analysis should not be confined to these four criteria, and that the court "must instead consider all the relevant evidence, including evidence that does not fall

neatly within one of the above factors." Id. Other indicia of
"significant control" suggesting that a person was an employer
"may be persuasive" when incorporated with these four factors.
Id. at 470.

   With respect to the first Enterprise factor, the evidence
presented at trial established that Engin was significantly
involved in the process of hiring and firing employees. See Day
1 Tr. 97:2-4 (server testifying that "[Engin] talked to me for .
. . a few minutes about the job, and then he hired me."); id.
55:13-16 (testimony that Engin disciplined employees by, inter
alia, firing them). Defendants point to trial testimony from
Engin and Ihsan that Engin was not the ultimate decision maker
with respect to hiring or firing. However, this testimony is
inconsistent with the weight of the evidence. See Day 1 Tr.
97:2-6, 55:13-16; Ihsan Dep. 34:21-24, ECF No. 40-8 (Ihsan
testifying that he only hired servers "when [Engin's] not
there"). The first Enterprise factor therefore weighs in favor
of a finding that Engin was an employer under the FLSA.

   As relevant to the second Enterprise factor, Engin also had
the authority to set work assignments and was significantly
involved in promulgating work policies and conditions. See Day 3
Tr. 52:14-17, 53:9-16 (Engin and Ihsan shared the responsibility
of setting work schedules and assigning workstations); Day 4 Tr.
18:18-25 (servers asked Engin for approval to change the

schedule); Day 3 Tr. 54:10-15 (Ihsan and Engin "collaborate" to set work policies). Engin also exercised substantial control over day-to-day supervision and discipline at Empire. See Day 1 Tr. 43:5-7, 55:11-18. Thus, the second and third Enterprise factors also suggest that Engin is an employer.

Engin also exercised a level of control over employee records. As noted above, Engin worked together with Ihsan on payroll duties such as collecting timecards, sending timesheet records to Empire's payroll company, and distributing paychecks to employees. See Day 3 Tr. 55:22-24, 56:19-25, 57:7-17. The fourth Enterprise factor therefore also suggests that Engin is an employer.

After balancing the applicable factors, the Court finds that Engin is an employer under the FLSA. He will therefore be held jointly and severally liable together with his co-defendants.

**B.   Defendants Willfully Violated The FLSA**

In general, the statute of limitations for minimum wage and overtime violations under the FLSA is two years. See 29 U.S.C. § 255(a). However, if an employer violated the FLSA willfully, the statutory period is extended to three years. See id. A violation of the FLSA is considered willful if the employer knew that its conduct was prohibited by the Act or showed reckless disregard

for the legality of the conduct.[4] See McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 135 (1988).

After considering the evidence presented at trial, the Court finds that Defendant's violations of the FLSA were willful. As noted above, Ihsan admittedly knew that servers were entitled to make $7.25 per hour under federal law and used a baseless "guesstimate" figure of $7.63 per hour in Empire's records to give the appearance that servers made above the minimum wage. This demonstrates, at the very least, a reckless disregard for the FLSA's minimum wage and recordkeeping requirements.

Moreover, the weight of the evidence presented at trial suggests that both Ihsan and Engin interfered in the WH investigation by asking their employees to either lie to WH investigator Martin outright or to otherwise cover up certain practices that violated the FLSA. See Day 1 Tr. 43:19-44:5, 160:1-3, 167:14-21; Day 2 Tr. 38:24-39:8 (Engin directed employees to tell Martin that bussers only worked on weekends,

---

[4]     Defendants cite Souryavong v. Lackawanna County, 872 F.3d 122 (3d Cir. 2017), for the proposition that, beyond knowledge or recklessness, a "willful" FLSA violation "must have a degree of egregiousness akin to manipulation and concealment." Defs.' Br. at 12, ECF No. 95-1 (citing Souryavong, 872 F.3d at 126-27). But this argument is foreclosed by the Third Circuit's more recent decision in Stone v. Troy Construction, LLC, 935 F.3d 141 (3d Cir. 2019), in which the Court clarified that willfulness does not require evidence of any such "egregiousness." See 935 F.3d at 149 ("[According to [the defendant], 'Souryavong makes clear that establishing a willful violation requires . . . a degree of egregiousness[.]' We disagree." (internal citation omitted)).

which was false); <u>see also</u> Pl.'s Trial Ex. 46 ¶ 25 (Engin
directing employees to tell Martin that they never worked over
forty hours in a week); Day 1 Tr. 157:15-158:1 (Ihsan telling an
employee to keep two separate timecards so neither would show
she worked over forty hours in a week); <u>id.</u> 147:13-14 (Ihsan
telling an employee that he "should not clock in any hours over
forty"). Defendants' interference in the WH Investigation
suggests that they knew that their pay practices were not in
compliance with the FLSA. The Court accordingly must conclude
that they willfully violated the Act.[5]

### C.   Defendants are Liable for $675,626.67 in Back Wages

Plaintiff argues that Defendants are liable for $679,121.29
in back wages, consisting of $651,174.80 in minimum-wage back
wages and $27,946.49 in overtime back wages, based on the
records reported in Plaintiff's trial exhibit 2. Defendants
respond that even with a three-year statutory period for willful
violations, they are liable for only $596,103.89 in total back
wages. The difference between Plaintiff's and Defendants' back
wages calculations turns upon the following issues: (1) the date
that the damages period began based on the parties' agreement to

---

[5]      Defendants argue that their violations were not willful because they
reasonably relied upon a 1999 WH investigation they claim gave them a "clean
bill of health." Defs.' Br. at 12, ECF No. 95-1. But as the Court found
above, <u>supra</u> page 8 n.3, the evidence presented at trial was insufficient to
allow the Court to consider the 1999 investigation or its effect on this
case.

toll the statute of limitations before the filing of the
complaint; (2) whether Defendants may be held liable for conduct
after the conclusion of the WH investigation, or conduct which
occurred over three years after the damages period began; (3)
whether certain former employees that Defendants claim are
deceased are entitled to back wages; and (4) whether Defendants
are liable for additional back wages based on testimony that
they charged employees for breaking dishes. Each issue will be
considered in turn below.

As noted above, the parties signed an agreement to toll the
statute of limitations in this case from November 29, 2017, to
November 1, 2018, a period of 339 days. See Day 1 Tr. 35:6-18.
Plaintiff maintains that as a result of the tolling agreement,
the beginning of the damages period for willful violations is
November 25, 2014. This date is three years (representing the
three-year period for a willful FLSA violation) and 339 days
(representing the period the tolling agreement was in place)
prior to the filing of the complaint on October 30, 2018.
Defendants argue that the beginning of the applicable damages
period for a willful violation is January 12, 2015, but they
provide no cognizable explanation for that date in their
briefing. Given the 339-day period during which the statute of
limitations was tolled, and that Plaintiff's Complaint was filed

on October 30, 2018, the Court agrees with Plaintiff that the beginning of the applicable damages period is November 25, 2014.

Defendants next argue that regardless of the date on which the damages period began, they are only liable for violations that occurred within the three years (in the case of willful violations) following that date. However, a number of federal courts have held that FLSA defendants are liable for continuing violations of the FLSA, even after the completion of a government investigation or the filing of a complaint. See, e.g., U.S. Dept. of Labor v. Cole Enters., Inc., 62 F.3d 775, 777, 777 n.1 (6th Cir. 1995) (upholding an award of damages for FLSA violations after filing of the complaint based on evidence presented at trial); Pizzella v. Peters, 410 F. Supp. 3d 756, 767 (D. Md. 2019) ("The Fourth Circuit has held that FLSA plaintiffs may seek damages for continuing violations outside of the original investigation period under Section 17 of the Act." (citing Chao v. Self Pride, Inc., No. CIV RDB 03-3409, 2006 WL 4699954, at *3 n.5 (D. Md. Jan. 17, 2006), aff'd, 232 F. App'x 280 (4th Cir. 2007))); Perez v. Davis Design & Dev., Inc., Civ. A. No. 13-1118, 2013 WL 6835095, at *7-8 (W.D. Pa. Dec. 23, 2013). Defendants cite no contrary authority. Based on the preceding cases, the Court concludes that Defendants are liable for back wages based on their continued violations of the FLSA.

Defendants also seek to reduce Plaintiff's calculation of back wages by subtracting what they would otherwise owe to a number of employees that Defendants claim are deceased. But even if the estates of these deceased employees were not entitled to the employees' back wages under the law, Defendants have not presented any evidence to support their claim that these employees are in fact deceased. The Court will accordingly award back wages to these employees.

Finally, Defendants argue that Plaintiff's calculation of back wages should be reduced because it includes an award for Defendants' purported charging for broken dishes that was not adequately substantiated at trial. As set forth in footnote 1, above, the Court agrees. Plaintiff's calculation includes an award of $32.66 to each employee owed back wages. See Pl.'s Trial Ex. 34. Given that there are 107 employees identified as victims in this action, Plaintiff's total back wages figure will be reduced by $3,494.62.

In sum, the Court concludes that Plaintiff's calculation of back wages is accurate except to the extent it seeks $3,494.62 in damages to compensate former employees for broken dishes. Defendants are therefore liable for $675,626.67 in back wages.

**D.   Defendants are Liable for Liquidated Damages**

Under section 216(c) of the FLSA, the Department of Labor may recover both unpaid wages and an additional equal amount in

liquidated damages for violations of the minimum wage and overtime requirements. See 29 U.S.C. § 216(c). These liquidated damages are not punitive, but compensatory; they "compensate employees for losses they might suffer by reason of not receiving their lawful wage at the time it was due." Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 907 (3d Cir. 1991) (quoting Marshall v. Brunner, 668 F.2d 748, 753 (3d Cir. 1982)).

In challenging the appropriateness of liquidated damages, the employer bears the "plain and substantial" burden of establishing both good faith and reasonable grounds for the violation. Id. at 907-08 (quoting Williams v. Tri-County Growers, Inc., 747 F.2d 121, 128-29 (3d Cir. 1984)). "If the employer fails to come forward with plain and substantial evidence to satisfy the good faith and reasonableness requirements, the district court is without discretion to deny liquidated damages." Williams, 747 F.2d at 129 (first citing Marshall, 668 F.2d at 753; then citing Laffey v. Nw. Airlines, Inc., 567 F.2d 429, 465 (D.C. Cir. 1976), abrogated on other grounds sub nom. McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988); then citing Richard v. Marriott Corp., 549 F.2d 303, 305-06 (4th Cir. 1977); then citing McClanahan v. Matthews, 440 F.2d 320, 322 (6th Cir. 1971); and then citing Rothman v. Publicker Indus., 201 F.2d 618, 620 (3d Cir. 1953)).

To carry its burden of establishing good faith, an employer must first show that it "took affirmative steps to ascertain the Act's requirements, but nonetheless, violated its provisions." Martin, 940 F.2d at 908. The employer has a duty to ascertain the FLSA's requirements and may not wait for complaints from others, such as employees, before complying. See Keeley v. Loomis Fargo & Co., 183 F.3d 257, 270 (3d Cir. 1999) (quoting Williams, 747 F.2d at 129). The employer must prove "an honest intention to ascertain and follow the dictates of the Act." Marshall, 668 F.2d at 753 (citing Laffey, 567 F.2d at 464).

Next, the "reasonableness" requirement requires that the employer had reasonable grounds for believing it was in compliance. Id. Reasonableness is an objective standard, and to satisfy the standard the employer must act "as a reasonably prudent man" would under the same circumstances. Brooks v. Vill. of Ridgefield Park, 185 F.3d 130, 137 (3d Cir. 1999) (quoting Addison v. Huron Stevedoring Corp., 204 F.2d 88, 92 (2d Cir. 1953)). "[I]gnorance alone is not sufficient in meeting the objective test." Id. (citing Marshall, 668 F.2d at 753).

Defendants argue that they acted in good faith and reasonably because they relied upon their CPAs and payroll companies in carrying out their pay practices.[6] However, despite

---

[6]     Defendants also argue that they acted reasonably and in good faith because they relied upon the 1999 investigation's purported "clean bill of

the fact that Defendants hired payroll professionals, the evidence presented at trial fails to demonstrate that Defendants had "an honest intention to ascertain and follow the dictates of the [FLSA]." Marshall, 668 F.2d at 753 (citing Laffey, 567 F.2d at 464). On the contrary, Ihsan admitted that he never consulted with an accountant about his practice of using a "guesstimate" to create the appearance that Empire's servers were making minimum wage.[7] See Day 3 Tr. 87:4-12.

Defendants also point out that none of its employees ever complained of any FLSA violation. However, the law is clear that employers may not wait for complaints from others, such as employees, before complying with the FLSA. See Keeley v. Loomis Fargo & Co., 183 F.3d at 270. Nor does Defendants' attempted interference with the WH investigation suggest "an honest intention to ascertain and follow the dictates of the Act." Marshall, 668 F.2d at 753 (citing Laffey, 567 F.2d at 464). Because Defendants have failed to demonstrate that they acted in good faith or had reasonable grounds for believing they were in compliance with the FLSA, the Court concludes they are liable for liquidated damages.

---

health." However, as noted above, the Court is unable to find any facts regarding this investigation based on the evidence presented at trial.

[7]    Defendants identify two Certified Public Accountants they engaged at different times to assist with their payroll. At all times relevant to this action the Defendants' accountant was Ali Gunaydin, the son of Ihsan and brother of Engin. Day 3 Tr. 94:8-19.

**E.   Injunctive Relief is Appropriate**

The FLSA authorizes district courts to issue injunctive relief "restrain[ing] violations" of sections 206 and 207 upon a showing of cause. 29 U.S.C. § 217. In deciding whether to grant an injunction, courts consider "(1) 'the employer's past conduct'; (2) the employer's 'current conduct'; and (3) 'most importantly, whether the employer can be counted on to comply with the FLSA in the future.'" Acosta v. Osaka Japan Rest., Inc., No. 17-cv-1018, 2018 WL 3397337, at *17 (E.D. Pa. July 12, 2018) (quoting Acosta v. Cent. Laundry Inc., No. 15-cv-1502, 2018 WL 1726613, at *10 (E.D. Pa. Apr 10, 2018), aff'd in part, rev'd in part on other grounds, 790 F. App'x 368 (3d Cir. 2019)).

Upon consideration of Defendants' conduct, the Court will enjoin Defendants from violating sections 206 and 207 of the FLSA. As the Court has already found, supra section III(B), Defendants willfully violated the FLSA. Moreover, Defendants interfered in the WH investigation in an attempt to cover up their violations. Finally, the evidence presented at trial showed that Defendants continued to violate the overtime and minimum wage requirements of the FLSA even after the final meeting with WH Investigator Martin. Under these circumstances, the Court cannot count on Defendants to comply with sections 206 and 207 of the FLSA in the future.

## IV.   CONCLUSION

For the foregoing reasons, the Court will enter judgment in favor of Plaintiff and against Defendants Ihsan Gunaydin, Engin Gunaydin, and Empire Diner in the amount of $1,351,253.34, consisting of $675,626.67 in back wages and an equal amount in liquidated damages. The Court will also permanently enjoin Defendants from violating sections 206 and 207 of the FLSA.

An appropriate judgment follows.